**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

**RODERICK BATES**                                                                    **PLAINTIFF**

**v.**

**BILOXI PUBLIC SCHOOL DISTRICT;**                          1:25cv99 TBM-RPM
**MARCUS BOUDREAUX (official & individual capacities);**
**EDDIE LOFTON (individual capacity);**
**CECIL SCOTT POWELL (individual capacity);**              **DEFENDANTS.**

<u>**COMPLAINT**</u>

Roderick Bates told the Athletic Director (AD) of the Biloxi Public School District that

the AD was discriminating based on race. In response, the AD cursed at Bates and got him fired.

For these reasons, COMES NOW THE PLAINTIFF and alleges as follows:

<u>PARTIES</u>

1. Plaintiff Roderick Bates is an adult resident of Mississippi.

2. Bates's race is Black.

3. Bates worked for the Biloxi Public School District in Harrison County.

4. Defendant Biloxi Public School District is an employer with locations in Harrison
   County, Mississippi.

5. All relief sought under all counts of this Complaint are sought against BPSD jointly and
   severally with such others as may be liable.

6. BPSD can be served with process via its Superintendent, Marcus Boudreaux, at his office
   160 St. Peter Street, Biloxi, MS 39530.

7. BPSD is a local public school district.

8. BPSD is a "state actor" subject to Section 1983 and the U.S. Constitution under *Jett v.
   Dallas Independent School Dist.*, 491 U.S. 701 (1989).

9. BPSD is not an "arm of the state" and lacks Eleventh Amendment immunity under *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274 (1977).

10. BPSD was Plaintiff's employer.

11. BPSD is subject to Title VII, COBRA, the ADEA and 42 U.S.C. 1983.

12. BPSD has more than 500 employees.

13. During Plaintiff's time working for BPSD, Plaintiff was protected by Title VII, COBRA, the ADEA and 42 USC 1983.

14. BPSD is in a strong financial condition.

15. BPSD has over $80,000,000 in annual revenues/budget.

16. Defendant Marcus Boudreaux is the Superintendent of BPSD.

17. On information and belief, Boudreaux's salary is approximately $160,000 gross per year, plus benefits expensed by BPSD at over $40,000 per year.

18. He can be served with process at his office: 160 St. Peter Street, Biloxi, MS 39530.

19. Boudreaux is sued in both an individual capacity, and in his official capacity as Superintendent.

20. The only claims brought in this matter against Boudreaux in his official capacity are claims (under any Count) for prospective relief under *Ex Parte Young* (such as reinstatement under *Nelson v. University of Texas at Dallas*, 535 F. 3d 318 (5th Cir. 2008)) for which BPSD successfully claims some form of immunity or defense (*i.e., Monell*, Eleventh Amendment, sovereign immunity, etc). No relief redundant with that which is available against BPSD is sought pursuant to this official capacity claim.

21. The only claims brought in this matter against Boudreaux in his individual capacity are claims under Section 1983 (including constitutional and 1981 claims). No claims under Title VII or the ADEA are brought against Boudreaux in his individual capacity.

22. Boudreaux decided to fire Plaintiff from his job.

23. Boudreaux was a person acting under color of state law in firing Plaintiff.

24. Defendant Eddie Lofton is the Athletic Director of BPSD.

25. Lofton can be served with process at his worksite, 1845 Tribe Dr., Biloxi, MS 39532.

26. Lofton is sued in an individual capacity.

27. On information and belief, Lofton's salary is approximately $105,000 gross per year, plus benefits expensed by BPSD at over $30,000 per year.

28. The only claims brought in this matter against Lofton are claims under Section 1983 (including constitutional and 1981 claims). No claims under Title VII or the ADEA are brought against Lofton individually.

29. Lofton provided some of the information which formed the basis for firing Plaintiff from his job.

30. Lofton did so in order to get Plaintiff fired.

31. Lofton recommended firing Plaintiff.

32. But for Lofton's actions, Plaintiff would not have been fired.

33. Lofton was a person acting under color of state law in his actions related to Plaintiff.

34. Assuming Lofton's actions were unconstitutionally or unlawfully motivated under Section 1983, he is individually liable as a "causal link" in Plaintiff's termination under *Sims v. City of Madisonville*, 894 F. 3d 632 (5th Cir. 2018).

35. Defendant Cecil Scott Powell is the Director of Personnel of BPSD.

36. Powell can be served with process at his worksite, 160 St. Peter Street, Biloxi, MS 39530

37. Powell is sued in an individual capacity.

38. On information and belief, Powell's salary is approximately $107,000 gross per year, plus benefits expensed by BPSD at over $30,000 per year.

39. The only claims brought in this matter against Powell are claims under Section 1983 (including constitutional and 1981 claims). No claims under Title VII or the ADEA are brought against Powell individually.

40. Powell collected and/or provided the information which formed the basis for firing Plaintiff from his job.

41. Powell did so in order to get Plaintiff fired.

42. Powell recommended and/or approved and/or signed-off on firing Plaintiff.

43. But for Powell's actions, Plaintiff would not have been fired.

44. Powell was a person acting under color of state law in his actions related to Plaintiff.

45. Assuming Powell's actions were unconstitutionally or unlawfully motivated under Section 1983, he is individually liable as a "causal link" in Plaintiff's termination under *Sims v. City of Madisonville*, 894 F. 3d 632 (5th Cir. 2018).

<u>JURISDICTION, VENUE, EXHAUSTION, AND JURY DEMAND</u>

46. Jurisdiction is proper in this honorable Court under 28 U.S.C. § 1331 because this claim arises under federal law, including Title VII.

47. Venue is proper in this honorable Court under 28 U.S.C. § 1391 because all work at issue was located in and around Harrison County, Mississippi.

48. Plaintiff was fired on or about March 29, 2024.

49. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission.

50. This charge was filed on April 26, 2024.

51. This charge was filed within 180 days of the events which are the subject of the Title VII and ADEA counts in this Complaint.

52. The charge alleged retaliation, race discrimination and age discrimination.

53. The EEOC issued a notice of right to sue to the Plaintiff.

54. This notice was issued on February 7, 2025.

55. Plaintiff brings this action within 90 days of receipt of that right-to-sue notice.

56. Plaintiff has met the timeliness and administrative exhaustion requirements of Title VII.

57. This action is brought within three years of Plaintiff's termination.

58. Plaintiff has met the timeliness requirements of 42 USC 1983 and COBRA.

59. Plaintiff demands a trial by jury on all issues so triable.

<u>FACTS</u>

**Background: Bates reasonably believes Lofton discriminates based on race**

60. When Lofton (race: White) was hired by BPSD, Bates observed a number of things that led him to the conclusion that Lofton (and other administrators) harbored racial animus. These are *inter alia* as follows:

**Hiring of Welter**

61. On or about 2018, Lofton announced to students and parents that Andrew (Drew) Welter (race: White, age: younger) was going to be hired as a strength and conditioning coach.

62. This was long before any job opening or advertisement for such a position was posted.

63. Welter had no teacher certification at this time.

64. Because of this history, when Welter was ultimately hired, it appeared to Bates to be a pre-selection based on Lofton's preference.

65. This pre-selection differed from the process by which Black coaches were hired as Bates observed it.

66. When Lofton recommended/selected a Black coach, it was only after an advertisement and search failed to yield a sufficiently qualified White coach.

67. No Black coach was announced as a new hire to parents and staff before the job opening was advertised.

**Treatment of student athletes and funds**

68. In his work with students on the baseball team, Bates observed a pattern whereby Lofton preferred to select and give playing time to White students over Black students.

69. Specifically, it appeared to Bates that Lofton preferred White students because he assumed (based on race) that they were more likely to be a source of athletic fundraising.

70. Bates's observations of the handling of athletic fundraising further suggested to Bates that Lofton had personal access to the cash raised without the required controls and accounting.

71. Bates heard that Lofton had been investigated by the Clinton School District for mishandling of funds.

**Other circumstances reflecting on Lofton's racial attitudes**

72. Bates also learned from coworkers that Lofton's son and daughter had each used racial slurs (the "N" word) to refer to Black students. Lofton was aware of the activity and no known punishment was meted out.

73. From this, Bates concluded that Lofton at least tolerated or - more likely - himself modeled and encouraged racism, slurs and other manifestations of racist attitudes in the home.

**Time records and docking**

74. On or about 2023, Bates had his pay docked because his time records were inaccurate.

75. Meanwhile, he was informed by a White coach - Katlan French - that French's own time records were far more inaccurate for much longer, and that they never docked his pay.

76. Based on the above and other observations, Bates came to the reasonable good faith belief that his superiors at BPSD - and Lofton specifically - discriminated based on race.

## First Protected Activity

77. On February 22, 2024, Lofton called Bates into his office.

78. Lofton asked Bates what was going on with strength training for eighth-grade football players.

79. Bates said he was trying to work with the high school basketball team at that time, and his hands were full.

80. Bates was concerned to understand his mix of job duties, and asked about Welter's role and whether he could do the strength work for eighth-grade football.

81. Lofton told Bates "you don't need to worry about that."

82. Bates again asked what Welter was doing, since he apparently only had seventh and eighth grade to work with.

83. Lofton responded by threatening Bates using profanity, stating "I can make it hard for your ass."

84. This was the first use of an obscenity at this meeting.

85. Bates told Lofton that he felt Lofton's actions were "wrong" and racially discriminatory in his different treatment of Welter and Bates.

86. Bates referred to Lofton as a racist.

87. In so doing, Bates opposed what he perceived as racial discrimination in Lofton's treatment of Welter and Bates.

88. The perception of racial discrimination was Bates's good faith, reasonable understanding of events.

89. Lofton responded by raising his voice against Bates.

90. Lofton said "damn you!" to Bates.

91. Bates responded to Lofton's provocation by also using similar profanity.

92. At this point, Hill came into the office and asked them to calm down.

93. Bates and Lofton then had a discussion for approximately one hour about how to work together to provide strength and conditioning support to all the athletic teams.

94. Bates's actions throughout this meeting were reasonable under the circumstances and protected activity pursuant to *Starling v. General Motors*, (3:21-CV-750-CWR-LGI) (Sept. 3, 2024).

**Decision to fire Bates**

95. Lofton was upset that Bates said that Lofton was discriminating based on race.

96. After the meeting, on information and belief, Lofton reported Bates's claim of race discrimination to Powell and/or Boudreaux.

97. Lofton sought to cause Bates to be fired for making this claim of race discrimination.

98. At this point, Powell and/or Boudreaux knew that Bates had said Lofton discriminated based on race, and that both Lofton and Bates had engaged in similar cursing and behavior toward one another at the meeting.

99. At this time, Powell and/or Boudreaux did not investigate whether Bates's claim of race discrimination was true.

100. Powell and/or Boudreaux did not investigate Lofton's cursing or behavior.

101. Powell and/or Boudreaux did not place Lofton on administrative leave pending investigation of the incident.

102. Powell and/or Boudreaux did not decide to fire Lofton based on his conduct, language or professionalism in this meeting.

103. Instead, on information and belief, at that time they decided to fire Bates in retaliation for Bates opposing what he perceived as Lofton's discrimination, and started a sham "investigation" to fabricate a pretext for termination.

104. They immediately began searching for Bates's replacement.

105. This included contacting and recruiting potential replacements.

**"Investigations" and additional protected activity**

106. On February 23, 2024, BPSD placed Bates on administrative leave.

107. BPSD told Bates the reason for placing him on leave was to investigate his conduct in the meeting with Lofton on February 22, 2024.

108. However, Powell's "investigation" included interviewing people who were not present at the meeting on February 22nd.

109. Powell asked questions to elicit any negative information about Bates that he could use to fire him.

110.    For example, Powell asked others whether Bates was racist, and asked for any other situation in which Bates had cursed.

111.    On or about March 5, 2024, Bates also filed a formal grievance alleging race discrimination.

112.    This was opposition to what Bates reasonably and in good faith believed was race discrimination.

113.    As an alternative/additional allegation, to the extent the factfinder concludes that the final decision to fire Bates was reached on or after March 5, 2024, Plaintiff contends that it was motivated by this protected activity on March 5, 2024.

114.    Powell purported to "investigate" these grievance claims as well.

115.    In interactions with Bates during this "investigation," Powell sought to provoke Bates and then use his reaction as a further pretext for a termination decision they had already reached.

116.    On March 22, 2024, BPSD issued a response to the grievance.

117.    On March 28, 2024, BPSD issued a termination letter to Bates stating he was terminated effective March 29, 2024.

**Pretextual reasons for termination**

118.    In this letter, the stated reason for termination was the "repeated" use of "profanity" and "unprofessional behavior."

119.    The stated reasons are false and/or pretextual.

120.    Some of the claims relied on were false.

121.    Other incidents were known to the district before, and had not justified termination at the time they occurred.

122.    Other incidents occurred (or were learned) after the district had decided to fire Bates, and were included solely to provide additional pretexts for termination.

123.    In truth, Bates's cursing was sporadic, not regular, and was typically responsive to provocation (as on February 22nd).

124.    Bates's use of language and his professionalism did not change throughout his roughly 14 years of employment.

125.    Bates's language did not justify investigation or termination until after Bates's claim of racism on February 22nd.

126.    BPSD also knew that identical or worse "profanity" and "unprofessional behavior" to that alleged against Bates was commonly used by the coaching staff.

127.    For example, in addition to the profanity used by Lofton in the meeting on February 22nd, Lofton had regularly used profanity in other meetings with staff.

128.    In one meeting with Bates and Hill, Lofton referred to a Black student athlete as a "piece of shit."

129.    Lofton had referred to student athletes as "pussies" and made homophobic "jokes."

130.    As another example involving Lofton, Lofton had a loud argument with a teacher (Deidra Wedgeworth) and cursed at the teacher in the classroom in front of students.

131.    Coach Hill had also engaged in extreme profanity and unprofessional behavior as part of his work.

132.    On at least one occasion, he was ejected from a game.

133.    The reason for his ejection was his cursing and unprofessional behavior.

134.    This occurred in front of students, both student athletes on the sidelines and spectators, not to mention administrators at the game.

135.    He also had physical altercations with student athletes.

136.    On one occasion, baseball coach Brent Martin flew into an angry rage and damaged school property.

137.    Martin punched a hole in the wall of the AD's office.

138.    Martin was not fired for it.

139.    Coach David King cursed at parents at football games, engaging in violent and disruptive behavior that required him to be physically separated from the situation.

140.    He was not fired for this.

141.    After Bates was fired, Matthew Sellers was hired as Bates's replacement.

142.    Sellers is over 20 years younger than Bates.

143.    Sellers had previously worked as an intern/assistant strength and conditioning coach with Bates and Lofton.

144.    Sellers had engaged in regular profanity in conversations with staff at Biloxi, and the administration was aware of this when Sellers was hired.

145.    The same is true with many other coaches and staff.

146.    Many engaged in far worse breaches of professionalism - including criminal misconduct - and did not get fired.

147.    For example, Ronnie Bogart engaged in unprofessional misbehavior that caused a serious disruption on campus

148.    On information and belief, Bogard's employment records at BPSD do not contain any discipline for unprofessional misbehavior.

149.    Mike Letlow engaged in repeated unprofessional misbehavior

150.    Letlow was not fired for the first or second incidents.

151.    Letlow was only fired after at least three incidents.

152.    Janet Block engaged in unprofessional misbehavior

153.    On information and belief, Blocks employment records at BPSD do not contain any discipline for unprofessional misbehavior.

154.    Katlin French engaged in unprofessional misbehavior.

155.    On information and belief, French's employment records at BPSD do not contain any discipline for unprofessional misbehavior.

156.    FNU Meritt engaged in repeated unprofessional misbehavior

157.    Merrit was not fired for the first or second incidents.

158.    Merrit was only fired after at least three incidents.

159.    Tracy Carter engaged in unprofessional misbehavior.

160.    Carter had a physical and verbal altercation during the workday with a coworker.

161.    Neither Carter nor the coworker were fired because of the altercation.

162.    For all these reasons and others, Bates believes that he was discriminated against based on race and/or age and/or retaliated against for complaining of discrimination.

**Damages**

163.    At the time of the termination, BPSD's administrators, managers, and supervisors involved had received training concerning the law's prohibition of race discrimination, age discrimination, and retaliation.

164.    The person who decided to fire Plaintiff knew at the time that it was illegal to fire an employee for race/age discriminatory or retaliatory reasons.

165.    Bates suffered emotionally as a result of his termination.

166.    Bates lost sleep and had other physical effects.

167.    He worried about his ability to pay bills and find other employment.

168.    He incurred expenses in seeking other work.

169.    He suffered severe dignitary harms in being required to experience discrimination and/or retaliation.

170.    Bates worked for gross wages of $57,920.50 per year.

171.    Bates also received benefits.

172.    The expensed benefits Bates received were over $20,000 per year.

173.    Bates total compensation in wages and benefits for the 2023-2024 school year would have been approximately $80,000 per year had he been permitted to work the full year.

174.    His compensation and benefits in the 2024-2025 school year would have been higher than $80,000 had he been permitted to work that school year.

**COBRA**

175.    Bates was a participant in benefit plans offered by BPSD and covered by ERISA.

176.    This includes health insurance benefits covered by COBRA.

177.    Bates was entitled to notice and an opportunity to participate in continuation of health insurance coverage under COBRA.

178.    BPSD and its plan administrator failed to comply with the notice requirements of COBRA.

179.    As a result, Bates was not enrolled in continuation of coverage.

180.    As a result, he incurred additional costs in unreimbursed medical expenses.

**July 2022: Additional issues concerning pay discrimination**

181.    BPSD uses a set of pay scales to set pay for employees across the district.

182.    This includes pay scales for teachers, as well as separate pay scales for other kinds of employees.

183.    In addition, BPSD awards additional pay, called a "supplement," to coaches based on the duties they perform.

184.    Bates was hired by BPSD as the Strength and Conditioning Coach and the Powerlifting Coach at Biloxi High School on September 14, 2010.

185.    Bates is not certified by the Mississippi Department of Education, however he has a college degree relevant to teaching strength and conditioning.

186.    Bates was hired as a teacher.

187.    Bates had a primary duty of teaching, tutoring, instructing or lecturing in the activity of imparting knowledge, and was employed and engaged in this activity as a teacher by BPSD. His work coaching athletes was engaging in teaching. Coaching activities are a recognized part of the schools' responsibility in contributing to the educational development of the student.

188.    BPSD applied policies only applicable to certified teachers to Bates, including GBU Section V, and the licensed educator code of ethics.

189.    In 2010, Bates was placed on the BPSD pay scale for teachers and paid for 200 days.

190.    Bates later learned that his predecessor (White) had more days.

191.    From 2010 until 2022, Bates remained on the pay scale for teachers.

192.    During these years, Bates received pay increases based on the pay scale for teachers, including raises or other changes made to that pay scale.

193.    In short, until July 2022, Bates was treated as a certified teacher for the purposes of calculating his pay and setting expectations for professionalism and ethics.

194.    On or about July 2022, however, Bates's pay was calculated in a different way, and was not increased based on the pay scale for teachers.

195.    This was a violation of BPSD policy.

196.    Bates believed based on conversations with others that he was singled out for this, and that white employees in similar circumstances had not been treated in the same way.

<u>CAUSES OF ACTION</u>

197.    Wherever necessary, these allegations should be understood as pled in the alternative.

COUNT I: DISCRIMINATORY PAY

198.    Plaintiff incorporates all allegations set forth in all other sections of this complaint.

199.    Under the Equal Protection Clause, 42 USC 1981, Title VII, and 42 USC 1983, it is unlawful to pay a person less based on a person's race.

200.    BPSD paid Plaintiff less based on his race beginning on or about July 2022.

201.    This violates the law.

202.    In doing so, BPSD harmed Plaintiff.

203.    For this count, the only Title VII claims asserted are those concerning paychecks which are timely under the Lilly Ledbetter Fair Pay Act given the charge-filing date. The Equal Protection, 1981 and 1983 claims are timely back to at least 2022.

COUNT II: FOURTEENTH AMENDMENT, DISCRIMINATORY TERMINATION

204.    Plaintiff incorporates all allegations set forth in all other sections of this complaint.

205.    Under 42 USC 1983 and Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution, it is unlawful to take adverse employment action based on a person's race.

206.    Defendants fired Plaintiff based on his race.

207.    Defendants' termination of Plaintiff was an adverse action.

208.    This violates the law.

209.    In doing so, Defendant harmed Plaintiff.

COUNT III: CIVIL RIGHTS ACT OF 1964, DISCRIMINATORY TERMINATION

210.    Plaintiff incorporates all allegations set forth in all other sections of this complaint.

211.    Under Title VII, it is unlawful to take adverse action based on a person's race.

212.    BPSD fired Plaintiff based on his race.

213.    BPSD's termination of Plaintiff was an adverse action.

214.    This violates the law.

215.    In doing so, Defendant harmed Plaintiff.

COUNT IV: CIVIL RIGHTS ACT OF 1866, DISCRIMINATORY TERMINATION

216.    Plaintiff incorporates all allegations set forth in all other sections of this complaint.

217.    Under 42 USC 1981 and 42 USC 1983, it is unlawful to take adverse action based on a person's race.

218.    BPSD fired Plaintiff based on his race.

219.    BPSD's termination of Plaintiff was an adverse action.

220.    This violates the law.

221.    In doing so, BPSD harmed Plaintiff.

COUNT V: FOURTEENTH AMENDMENT, RETALIATION

222.    Plaintiff incorporates all allegations set forth in all other sections of this complaint.

223.    Under the Fourteenth and First Amendments of the U.S. Constitution, it is unlawful retaliation to fire Plaintiff because of his conversation with Lofton on February 22, 2024 and/or his grievance of March 5, 2024, and related speech.

224.    Defendants took adverse action against Plaintiff because of these protected activities.

225.    Defendants' termination of Plaintiff was an adverse action.

226.    This violates the law.

227.    In doing so, Defendants harmed Plaintiff.

COUNT VI: CIVIL RIGHTS ACT OF 1964, TITLE VII, RETALIATION

228.    Plaintiff incorporates all allegations set forth in all other sections of this complaint.

229.    Under Title VII, it is unlawful retaliation to take adverse action because a person opposes what he reasonably believes to be discrimination or harassment.

230.    Plaintiff engaged in protected activity by opposing and reporting what he reasonably believed was discrimination and/or harassment.

231.    BPSD took adverse action against Plaintiff because of these protected activities.

232.    BPSD's leave, investigation and termination of Plaintiff were adverse.

233.    The entire course of conduct was sufficiently adverse to deter a reasonable person from protected activity.

234.    This violates the law.

235.    In doing so, Defendant harmed Plaintiff.

COUNT VII: CIVIL RIGHTS ACT OF 1866, 42 USC 1981, RETALIATION

236.    Plaintiff incorporates all allegations set forth in all other sections of this complaint.

237.    Under 42 USC 1981, it is unlawful retaliation to take adverse action because a person opposes what he reasonably believes to be discrimination or harassment.

238.    Plaintiff engaged in protected activity by opposing and reporting what he reasonably believed was discrimination and/or harassment.

239.    BPSD took adverse action against Plaintiff because of these protected activities.

240. BPSD's termination of Plaintiff was an adverse action.

241. The entire course of conduct was sufficiently adverse to deter a reasonable person from protected activity.

242. This violates the law.

243. In doing so, Defendant harmed Plaintiff.

## COUNT VIII: AGE DISCRIMINATION IN EMPLOYMENT ACT

244. Plaintiff incorporates all allegations set forth in all other sections of this complaint.

245. Under the ADEA, it is unlawful to take adverse action against a person over 40 years of age because of the person's age.

246. Plaintiff is over 40 years of age.

247. Plaintiff was fired and replaced by a much younger person.

248. The reasons given for Plaintiff's termination are a pretext for age discrimination.

249. The termination of Plaintiff was an adverse action.

250. This violates the law.

251. In doing so, Defendant harmed Plaintiff.

## COUNT IX: COBRA

252. Plaintiff incorporates all allegations set forth in all other sections of this complaint.

253. Under ERISA and COBRA, it is unlawful to fail to give proper notice and an opportunity to participate in continuation of coverage after terminating an employee.

254. Defendant terminated Plaintiff.

255. Defendant failed to give the required notice.

256. Plaintiff therefore did not receive continuation of coverage and incurred damages in unreimbursed health care costs.

257.    This violates the law.

258.    In doing so, Defendant harmed Plaintiff.

<u>REMEDIES</u>

259.    Plaintiff seeks all remedies available, including but not limited to the following:

a.    A final judgment declaring that Defendant has violated the law;

b.    An injunction curing Defendant's unlawful actions and prohibiting any future similar actions;

c.    Notice given to all employees regarding the violations found by this Court, and notifying such employees of the order entered proscribing any future similar violations;

d.    Any other equitable relief as this honorable Court deems appropriate;

e.    Back pay;

f.    Statutory liquidated damages if applicable;

g.    Reinstatement and/or front pay, as appropriate;

h.    Compensatory damages for emotional distress and any other non-pecuniary harms flowing from Defendant's unlawful actions;

i.    Consequential damages and any other pecuniary harms flowing from Defendant's unlawful actions;

j.    Punitive damages commensurate with the misconduct and necessary to deter future violations of the law;

k.    Nominal damages if no other damages are available;

l.    Pre- and post-judgment interest;

m.    Attorney fees;

n. Costs; and/or,

o. Any other relief available under any applicable principle of law or equity.

DATE: March 31, 2025.

Respectfully submitted,

RODERICK BATES, Plaintiff

By: _/s/ Joel F. Dillard (MSB No. 104202)_
Joel F. Dillard
775 North Congress Street
Jackson, Mississippi 39202
(601) 509-1372 x2
joel.f.dillard@gmail.com